UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FAHAD JAFRI and HOPE FAIR HOUSING CENTER, | ) | |
| | ) | |
| Plaintiffs, | ) | 11 C 2421 |
| | ) | |
| and | ) | Judge Feinerman |
| | ) | |
| PEOPLE OF THE STATE OF ILLINOIS *ex rel.* LISA MADIGAN, Attorney General of Illinois, | ) | |
| | ) | |
| Intervenor Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CHANDLER LLC, CHANDLER CONDOMINIUM ASSOCIATION, and UNKNOWN NON-HANDICAPPED OWNERS OF DEEDED HANDICAP PARKING SPACES AT CHANDLER CONDOMINIUMS, 450 E. WATERSIDE DR., CHICAGO, IL, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Fahad Jafri and Hope Fair Housing Center brought this suit against Defendants Chandler LLC ("Chandler") and Chandler Condominium Association ("Association"), the developer and condominium association, respectively, of a condominium building where Jafri once lived, alleging that the unavailability of accessible parking in the building violated the Fair Housing Act ("FHA"), as amended by the Fair Housing Act Amendments of 1988, 42 U.S.C. § 3601 *et seq.* Doc. 9. The People of the State of Illinois, on the relation of the Attorney General of Illinois, intervened as a plaintiff, alleging violations of the FHA, the Illinois Environmental Barriers Act ("IEBA"), 410 ILCS 25/1 *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775

-1-

ILCS 5/1-101 *et seq.* Docs. 52, 53. The Association answered. Docs. 35, 65. Chandler

answered Plaintiffs' amended complaint, Doc. 36, and moved for judgment on the pleadings

under Federal Rule of Civil Procedure 12(c), Doc. 37. Chandler then moved to dismiss the

State's complaint under Rule 12(b)(6). Doc. 55. The court denied both of Chandler's motions in

a minute order, Doc. 130, and this opinion sets forth the rationale for the denials.

## Background

On a motion under Rule 12(b)(6) or Rule 12(c), the court assumes the truth of the

complaint's well-pleaded factual allegations, though not its legal conclusions. *See Reger Dev.,*

*LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010); *N. Ind. Gun & Outdoor Shows, Inc. v.*

*City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) ("We review 12(c) motions under the

same standard as a motion to dismiss under Rule 12(b)."). The court must also consider

"documents attached to the complaint, documents that are critical to the complaint and referred

to in it, and information that is subject to proper judicial notice," along with additional facts set

forth in the non-movant's brief opposing dismissal, so long as those facts "are consistent with the

pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). To the extent an

exhibit contradicts the complaint's allegations, the exhibit takes precedence. *See Forrest v.*

*Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). The following facts are set forth

as favorably to Plaintiffs and the State as permitted by Plaintiffs' amended complaint, the State's

complaint, and the other materials that must be considered on Rule 12(b)(6) and 12(c) motions.

Chandler developed a 40-story condominium building, named "The Chandler," in the

Lakeshore East neighborhood of Chicago, Illinois. Doc. 9 at ¶¶ 8-9; Doc. 52 at ¶ 2. The

building, which was completed in 2007, has 342 parking spaces, seven of which are accessible by

persons with disabilities.  Doc. 9 at ¶¶ 9-10; Doc. 52 at ¶¶ 2, 19.  Chandler sold the accessible

spaces to persons without disabilities, and was able to charge a premium of between $15,000 and

$25,000 for each space in light of their attractive location and size.  Doc. 9 at ¶¶ 7, 20-21; Doc.

52 at ¶¶ 2, 20, 27.  Chandler sold the last accessible space on August 15, 2008.  Doc. 36-3.

Chandler continued to sell residential units and parking spaces for first occupancy through the

beginning of 2011, and it retained three non-accessible parking spaces for itself.  Doc. 9 at ¶¶ 8,

11; Doc. 42 at 2 n.4; Doc. 52 at ¶ 19.  The record includes seven "partial certificates of

occupancy" that the City of Chicago issued to The Chandler between June 2007 and February

2008.  Doc. 50 at 3-9.  The record does not indicate, one way or the other, whether the City

issued any additional certificates of occupancy to the Chandler after February 2008.  (The

affidavit submitted by Chandler regarding the seven partial certificates, Doc. 50 at 1-2, does not

aver that those certificates were the only ones issued or that the February 2008 certificate was the

last such certificate, but even if it did, the court could not consider the affidavit on a Rule 12(c)

motion.  *See Geinosky*, 675 F.3d at 745 n.1.)

Jafri has multiple sclerosis and chemotherapy-induced peripheral neuropathy.  Doc. 9 at

¶ 5.  He began renting a condominium in The Chandler on May 28, 2009.  Doc. 36-4.  At that

time, Jafri was relatively healthy and did not require an accessible parking space.  Doc. 20-2 at 2.

In July 2009, however, a series of medical setbacks severely limited his mobility.  Doc. 9 at ¶¶ 5,

19; Doc. 20-2 at 2; Doc. 38 at 2.  Those setbacks resulted in Jafri requiring an accessible space

because he needed to use a walker or wheelchair and experienced difficulty climbing stairs and

walking long distances.  Doc. 9 at ¶¶ 5, 19.  By the time Jafri moved into The Chandler, all seven

accessible spaces had been sold and were occupied by their owners, none of whom had a placard

allowing them to use an accessible space. *Id*. at ¶ 22; Doc. 52 at ¶¶ 3, 30. The Association

prohibited Jafri from temporarily parking in those spaces even though he had an accessible

parking placard. Doc. 9 at ¶¶ 5, 27; Doc. 52 at ¶ 30. Instead, Jafri had to park in a non-

accessible space and walk over 100 feet and climb stairs to reach the elevator. Doc. 9 at ¶ 23.

Jafri fell once and feared for his safety due to the poor cell phone reception in the garage. *Ibid*.

On April 29, 2010, Jafri asked the Association for a parking accommodation, *id*. at ¶ 28,

and Jafri's doctor informed the Association of his disability, *id*. at ¶ 5. The Association denied

the accommodation on the ground that all accessible spaces had been sold and none were

available for use. *Id*. at ¶¶ 28, 30-31; Doc. 52 at ¶¶ 3, 29. Hope Fair Housing, a non-profit

organization whose purpose is to promote equal opportunity in housing, *id*. at ¶ 4, also asked the

Association for an accommodation on Jafri's behalf and was turned down, *id*. at ¶ 32.

On June 1, 2010, Jafri filed a complaint with the Illinois Department of Human Rights

("IDHR") regarding the Association's failure to provide him with a reasonable accommodation.

Doc. 29 at 8. On October 29, 2010, the IDHR found Jafri's complaint to be unsupported by

substantial evidence, reasoning that his requested accommodation was unreasonable because all

accessible spots had been sold and none remained. *Id*. at 11-12.

On February 28, 2011, Jafri and Hope Fair Housing asked Chandler for an accessible

parking space and stated their intent to file suit. Doc. 20-2 at 28-29; Doc. 38 at 3. Plaintiffs

brought suit on April 11, 2011, and filed an amended complaint shortly thereafter. Doc. 9.

Plaintiffs then sought a preliminary injunction directing Defendants to allow Jafri to park in the

accessible spaces and to prohibit individuals without disabilities from parking in those spaces.

Doc. 19. Two weeks later, Chandler leased an accessible parking space to Jafri for a six-month

term, with the option to renew for three additional six-month terms.  Doc. 36-2.  Given that development, the court denied the preliminary injunction motion as moot.  Doc. 41.

Plaintiffs' amended complaint alleges that Chandler's "practice of selling [accessible] spaces has made it virtually impossible for [Jafri] or other persons with a handicap[] to rent or purchase units in the Chandler or to otherwise obtain access to a handicap parking space and has interfered with [Jafri's] ability to fully enjoy his dwelling," and that "the failure to provide handicap parking poses a real threat to Mr. Jafri's health and safety."  Doc. 9 at ¶¶ 22-23.  The amended complaint further alleges that Jafri "would be interested in purchasing a condominium unit at the Chandler," but that Chandler's "actions … have made housing unavailable to [Jafri]" because "he would not be able to utilize his dwelling … unless he could purchase a handicap parking space."  *Id*. at ¶ 20.  The amended complaint alleges that the Association "refused to enforce its obligation to ensure that handicap parking spaces are occupied only by vehicles exhibiting a handicap parking license plate" and has "failed to meet its legal obligation to ensure that accessible, handicap parking spaces are available for residents who require them."  *Id*. at ¶ 26.  The amended complaint claims that Defendants failed to make any number of reasonable accommodations, including requiring that an owner of an accessible space let Jafri use the space, purchasing back the accessible spaces and making them available to individuals with disabilities, purchasing contiguous parking spaces to create additional accessible parking, policing the use of the accessible spaces, or re-striping the parking facility to create more accessible parking.  *Id*. at ¶ 39.  Finally, the amended complaint alleges that the seven owners of the accessible spaces "illegally park" in those spaces because none has an accessible parking placard and that

"Chandler's sale of [the accessible] spaces for an illegal purpose [*i.e.*, use by a person without a disability] renders the deed to said spaces null and void." *Id*. at ¶¶ 7, 25, 43.

The amended complaint has six counts, which allege that: (1) Chandler violated 42 U.S.C. § 3604(f)(2) by selling all the accessible spaces to individuals without disabilities, *id*. at ¶ 40; (2) Chandler violated § 3604(f)(2) by "failing to retain a right to reassign deeded handicapped parking spaces from persons with no need for said spaces to persons with such a need," *id*. at ¶ 41; (3) Chandler's sale of accessible spaces for a premium price "intentionally discriminates against persons with a handicap and has a discriminatory effect with regard to the availability of handicap parking at the Chandler," *id*. at ¶ 42; (4) Chandler's "conveyance … of a deed for a handicap parking space to be illegally occupied by persons not authorized to park in handicap parking, is illegal as a matter of law and should be declared null and void *ab initio*," *id*. at ¶ 43; (5) the Association's refusal "to enforce the legal requirement that only persons with properly authorized handicap parking license plates or placards may park in a designated parking space, while enforcing other parking rules, discriminates against [Jafri] and other persons with a handicap in violation of 42 U.S.C. § [3]604(f)," *id*. at ¶ 44; and (6) the Association's failure to reasonably accommodate Jafri's disability violated 42 U.S.C. § 3604(f), *id*. at ¶ 45.

Jafri claims to have suffered physical injuries, pain and suffering, extreme emotional injury, humiliation, embarrassment, and inconvenience as a result of Defendants' failure to provide accessible parking. *Id*. at ¶¶ 35-36. Hope Fair Housing claims that it has been damaged because its time and money have been diverted from its other activities; that its disabled clients have been discriminated against; and that its goals, reputation, and institutional purposes have

been harmed. *Id*. at ¶ 34. Both plaintiffs seek injunctive relief, actual and punitive damages, and attorney fees and costs. *Id*. at 16-17.

The State's complaint in intervention, which relies on largely the same factual allegations as Plaintiffs' amended complaint, claims that Chandler's practice of selling accessible parking spaces to individuals without disabilities "denies current and future residents with disabilities the opportunity to use and enjoy the condominium building." Doc. 52 at ¶¶ 23-24. Citing Jafri as an example, the State claims that future renters or owners who need an accessible space will be unable to reside at The Chandler. *Id*. at ¶¶ 25-26. The State charges that the Association has a "policy … not to assist with providing an accessible spot to a resident with a disability," which "raises an issue of general public importance," and that "[b]ased on the actions of the Association …, it is reasonable to assume that any other current resident or future applicant would be similarly denied a reasonable accommodation." *Id*. at ¶ 31. And the State alleges that "residential units and parking spaces continue to be sold at [The Chandler]." *Id*. at ¶ 19.

On April 19, 2011, and again on June 17, 2011, the Attorney General sent Chandler a written request for information regarding its accessible parking spaces. *Id*. at ¶ 21. The first letter was sent to an individual who appears to be an officer of Magellan Development Group LLC, while the second letter was sent to an attorney for Magellan; the same attorney represents Chandler in this litigation. Docs. 52-1, 52-2. The attorney responded on behalf of Magellan, Chandler, and an entity called Aqua at Lakeshore East LLC, which developed a large condominium building, The Aqua, very close to The Chandler. Doc. 52-3; Doc. 52 at ¶ 10. The attorney's letter indicates that the accessible parking policies and practices at The Aqua and The Chandler are identical. The letter suggests, and the State's complaint alleges, that Magellan,

Chandler, and Aqua are closely related entities. Doc. 52-3; Doc. 52 at ¶ 10; *see also* Doc. 9 at ¶ 6 (alleging that Chandler and Magellan are "closely affiliated"). (Some of these facts are not expressly alleged in the text of a complaint, but rather are apparent from the letters, which are attached as exhibits to the State's complaint. Because the exhibits are referenced in that complaint, their contents may be considered on a Rule 12(c) motion. *See Williamson v. Curran*, 714 F.3d 432, 435-36 (7th Cir. 2013).) A website maintained by the Illinois Secretary of State reveals that all three entities have the same registered agent and principal office. *See* www.il.sos.gov/corporatellc (last visited Oct. 3, 2013). The website further reveals that the same four individuals serve as managers of Magellan and Chandler, and that the those individuals also serve as the managers of the manager (Lakeshore Aqua LLC) of the manager (Aqua Lakeshore Holdings LLC) of the manager (Aqua Mezzanine LLC) of the manager (Aqua SM LLC) of Aqua. *See ibid*.; *see also* Doc. 52 at ¶ 10 (alleging that Chandler and Magellan have overlapping leadership). Neither the attorney's letter nor anything else in the record indicates whether the last certificate of occupancy has issued for The Aqua or, if so, when.

The State's complaint has five counts, which allege that: (1) by selling accessible spots to individuals without disabilities, Chandler violated the FHA's mandate that persons with disabilities be provided an accessible route, *id*. at ¶¶ 7, 36-41; (2) the Association violated the FHA by failing to accommodate Jafri and by adopting a policy that similar residents would not be accommodated, *id*. at ¶¶ 7, 44; (3) Chandler's sale of the accessible spots to individuals without disabilities violated the IHRA and the IEBA, *id*. at ¶¶ 54-55; (4) Chandler engaged in a pattern and practice of discrimination under the IHRA by failing to retain accessible spots for individuals without disabilities, *id*. at ¶¶ 59-61; and (5) the Association engaged in a pattern and

practice of discrimination under the IHRA by failing to accommodate Jafri and adopting a policy

that similar residents would not be accommodated, *id*. at ¶¶ 66-68.  The State requests "[a]n

order prohibiting [Chandler] from continuing to discriminate against people with disabilities by

requiring all of the accessible spaces be turned over to the Association for purposes of using

them to accommodate individuals with disabilities," "[a]n order prohibiting [the Association]

from continuing to discriminate against people with disabilities by requiring them to provide

accessible parking as a reasonable accommodation," an order directing Chandler to comply with

the IEBA and a fine up to $250 per day until it does so, and a fine of both Chandler and the

Association up to $25,000 for violating the IHRA.  *Id*. at 10, 12, 14-15.

**Discussion**

I.      **Relevant Statutory, Regulatory, and Other Provisions**

      A.      **The FHA and Its Implementing Regulations**

The FHA is "a broad mandate to eliminate discrimination against and equalize housing

opportunities for disabled individuals." *Oconomowoc Residential Programs v. City of*

*Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002).  Section 3604(f)(2) makes it unlawful "[t]o

discriminate against any person in the terms, conditions, or privileges of sale or rental of a

dwelling, or in the provision of services or facilities in connection with such dwelling, because of

a handicap of—(A) that person; or (B) a person residing in or intending to reside in that dwelling

after it is so sold, rented, or made available; or (C) any person associated with that person."  42

U.S.C. § 3604(f)(2); *see Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1272-73 (10th

Cir. 2001).  Section 3604(f)(3) provides in relevant part that for "purposes of this subsection,"

meaning § 3604(f), "discrimination" includes "(C) in connection with the design and

-9-

construction of covered multifamily dwellings …, a failure to design and construct those dwellings in such a manner that—(i) the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons; … and (iii) all premises within such dwellings contain the following features of adaptive design: (I) an accessible route into and through the dwelling." 42 U.S.C. § 3604(f)(3)(C); *see also United States v. Edward Rose & Sons*, 384 F.3d 258, 262-63 (6th Cir. 2004); *Key Youth Servs.*, 248 F.3d at 1272-73; *United States v. Quality Built Constr. Inc.*, 309 F. Supp. 2d 767, 773-77 (E.D.N.C. 2003).

With respect to the design-and-construction requirement of § 3604(f)(3)(C), regulations promulgated by the U.S. Department of Housing and Urban Development ("HUD") state: "Accessible … means that the public or common use areas of the building can be approached, entered, and used by individuals with physical disabilities. The phrase 'readily accessible to and usable by' is synonymous with accessible." 24 C.F.R. § 100.201. The regulations further state: "Accessible route means a continuous unobstructed path connecting accessible elements and spaces in a building or within a site that can be negotiated by a person with a severe disability using a wheelchair and that is also safe for and usable by people with other disabilities. … Exterior accessible routes may include parking access aisles, curb ramps, walks, ramps, and lifts." *Ibid.*; *see also United States v. Shanrie Co.*, 669 F. Supp. 2d 932, 938-39 (S.D. Ill. 2009) (citing "no accessible parking" as a reason why a building was not "accessible to and usable by persons with disabilities"); *Balt. Neighborhoods, Inc. v. Sterling Homes Corp.*, 1999 WL 1068458, at *4 (D. Md. Mar. 25, 1999) (holding that "insufficient and inaccessible handicapped parking" violated the design-and-construction requirement); *Balt. Neighborhoods, Inc. v. Rommel Builders, Inc.*, 40 F. Supp. 2d 700, 713 (D. Md. 1999) (same). Chandler indisputably is

a "covered multifamily dwelling" for purposes of § 3604(f)(3)(C). Fairly read, Plaintiffs'

amended complaint alleges that Chandler violated § 3604(f)(2)—discriminating "in the terms,

conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

in connection with such dwelling"—by failing to ensure that residents with disabilities could

obtain accessible parking at The Chandler.

The FHA establishes two safe harbors for the design-and-construction requirement: (1)

compliance with "the American National Standard for buildings and facilities providing

accessibility and usability for physically handicapped people (commonly cited as 'ANSI

A117.1')"; and (2) compliance with any analogous state standard. 42 U.S.C. § 3604(f)(4)-(5). In

addition, the regulations list several non-exclusive "HUD-recognized safe harbors" deemed

sufficient to satisfy the design-and-construction requirements. Those safe harbors are

compliance with: (1) HUD's Fair Housing Accessibility Guidelines ("FHAG"), 56 Fed. Reg.

9472 (Mar. 6, 1991), in conjunction with the Supplement to Notice of Fair Housing Accessibility

Guidelines: Questions and Answers About the Guidelines, 59 Fed. Reg. 33362 (June 28, 1994);

(2) the Fair Housing Act Design Manual ("FHDM") (Apr. 1998),

http://www.huduser.org/portal/publications/destech/fairhousing.html (portions of which are

reproduced at Doc. 64-1); (3) the 2000 ICC Code Requirements for Housing Accessibility; or (4)

the 2000, 2003, and 2006 International Building Codes. 24 C.F.R. § 100.205(e)(2)(i)-(vi); *see

also Barker v. Niles Bolton Assocs.*, 316 F. App'x 933, 941-42 (11th Cir. 2009); *United States v.

Shanrie Co.*, 2007 WL 980418, at *11 (S.D. Ill. Mar. 30, 2007); *United States v. Edward Rose &

Sons*, 246 F. Supp. 2d 744, 750-51 (E.D. Mich. 2003); *United States v. Taigen & Sons, Inc.*, 303

F. Supp. 2d 1129, 1151, 1154 (D. Idaho 2003); *United States v. Pac. Nw. Elec., Inc.*, 2003 WL 24573548, at *43 (D. Idaho 2003).

One of the FHAG and FHDM safe harbors applies to buildings that make two percent of their parking spaces accessible. *See* 56 Fed. Reg. at 9505; FHDM at 2.20, 2.23. (Chandler does not argue that the FHAG and FHDM are invalid interpretations of the FHA—in fact, Chandler relies on those documents and attaches the FHDM to one of its briefs, Doc. 38 at 8, Doc. 57 at 5, Doc. 64 at 1-8, 13; Doc. 64-1—and thus has forfeited, if not waived, the point for purposes of these motions.) To fit within this safe harbor, however, a building not only must have the requisite number of accessible spaces, but also must make those spaces available to persons with disabilities. This is evident from the FHAG's and FHDM's discussion of what a building must do if all accessible spaces are occupied. In response to questions regarding the situation presented in this case—where all accessible spaces have been sold, with none available for a person with a disability—the FHAG states: "Condominiums subject to the requirements of the [FHA] must provide accessible spaces for two percent of covered units. One approach … would be for condominium documents to include a provision that accessible spaces may be reassigned to residents with disabilities, in exchange for nonaccessible spaces that were initially assigned to units that were later purchased by persons with disabilities." 56 Fed. Reg. at 9486. HUD subsequently clarified that the FHAG require a building to provide additional accessible parking beyond the two percent figure if necessary to accommodate disabled persons: "[FHAG] provide that a minimum of two percent of the parking spaces … be made accessible. … Also, if a resident requests an accessible space, additional accessible parking spaces would be necessary if the two percent are already reserved." 59 Fed. Reg. at 33366. The FHDM makes the same point:

"If buyers or renters request an accessible space at the time of first sale or rental, it may be necessary to provide additional accessible parking spaces if the two percent are already reserved. … If the spaces that make up the two percent count are not being used by residents with disabilities, [the additional accessible] space(s) may be moved to a resident requested location near a building or unit entrance.  These new parking spaces must be on an accessible route including curb ramps."  FHDM at 2.23.

### B.      The IHRA and the IEBA

The accessibility requirements of the IHRA and IEBA are materially identical for present purposes to those imposed by the FHA.  The IHRA makes it a civil rights violation (1) "to refuse to sell or rent or to otherwise make unavailable or deny a dwelling to any buyer or renter because of a disability"; (2) "to alter the terms, conditions or privileges of sale or rental of a dwelling or the provision of services or facilities in connection with such dwelling because of a disability"; (3) "to refuse to permit, at the expense of the person with a disability, reasonable modifications of existing premises"; (4) "to refuse to make reasonable accommodations"; or (5) "to fail to design and construct" accessible buildings.  775 ILCS 5/3-102.1.  The Attorney General of Illinois may bring a civil action to enforce the IHRA if she "has reasonable cause to believe that any person … is engaged in a pattern and practice of discrimination prohibited by [the IHRA]."  775 ILCS 5/10-104(A)(1).  "Such actions shall be commenced no later than 2 years after the occurrence or the termination of an alleged civil rights violation."  *Ibid.*  The Attorney General may obtain equitable relief and a civil penalty not to exceed $25,000 for each violation if the defendant has not committed any prior IHRA violations, with the fine escalating for recidivists.  *See* 775 ILCS 5/10-104(B)(1).

-13-

Like § 3604(f)(3)(C), the IHRA's design-and-construction provision requires "an accessible route into and through the dwelling." 775 ILCS 5/3-102.1(C)(3)(c)(i). The IHRA establishes a safe harbor, the Illinois Accessibility Code ("IAC"), 71 Ill. Admin. Code § 400.350(e)(1)-(6). *See* 775 ILCS 5/3-102.1(D). Like the FHA regulations, the IAC defines an "accessible route" as a "continuous unobstructed path connecting all accessible elements and spaces of a building or facility," and adds that "[e]xterior accessible routes may include parking access aisles." 71 Ill. Admin. Code § 400.210. The IAC requires that twenty percent of the units in a multifamily dwelling be "adaptable." *Id*. § 400.350(d). An adaptable dwelling unit must have an "accessible route" to "carports and garages designated for use by adaptable dwelling units." *Id*. § 400.350(e)(3). Moreover, "[a]t least one accessible route within the [dwelling] shall be provided from … accessible parking [and] accessible passenger loading zones … to an accessible building entrance." *Id*. § 400.310(a).

The IEBA directed the Capital Development Board to adopt and publish accessibility standards, *see* 410 ILCS 25/4, which led to enactment of the IAC, *see* 71 Ill. Admin. Code § 400.110(a). Unlike the IHRA, the IEBA makes compliance with the IAC mandatory rather than merely a safe harbor. *See* 410 ILCS 25/4 ("[The IAC] shall dictate minimum design and construction requirements."); 410 ILCS 25/8 ("The provisions of this Act and the regulations and standards promulgated hereunder constitute minimum requirements for all governmental units"); 71 Ill. Admin. Code 400.110(b) ("[The IAC] has the force of a building code and as such is law in the State of Illinois."). That is, the IEBA requires covered buildings to have an "accessible route" to "carports and garages designated for use by adaptable dwelling units," and "[a]t least one accessible route … from … accessible parking [and] accessible passenger loading zones …

to an accessible building entrance." 71 Ill. Admin. Code. §§ 400.310(a), 400.350(e)(3). The

Attorney General of Illinois is charged with enforcing the IEBA, and may bring an action seeking

equitable relief and a fine not to exceed $250 per day of noncompliance. *See* 410 ILCS 25/6,

25/7(a); 71 Ill. Admin. Code § 400.140.

## II.     Chandler's Motion For Judgment on the Pleadings Against Plaintiffs

### A.     Standing and Mootness

Chandler argues that Plaintiffs lack standing to assert their claims. Doc. 38 at 5-6.

Standing has three components: "(1) an 'injury in fact'—an invasion of a legally recognized

interest which is concrete and particularized, actual or imminent, and not conjectural or

hypothetical; (2) a causal link between that injury and the defendant's action, such that the injury

is fairly traceable to the action complained of; and (3) that a favorable decision will likely redress

the injury." *Sierakowsky v. Ryan*, 223 F.3d 440, 442-43 (7th Cir. 2000). Plaintiffs satisfy all

three components and therefore have standing.

First, Jafri alleges that he suffered injury due to the difficulties that the lack of an

accessible parking space caused him, and that his ability to purchase or rent a unit in the building

is hindered by the lack of available accessible spaces at The Chandler. *See Wernsing v.*

*Thompson*, 423 F.3d 732, 745 (7th Cir. 2005) (holding that the plaintiffs had standing to seek

declaratory relief and damages as redress for past injuries, "even if the underlying misconduct

which caused the injury has ended") (citing *Powell v. McCormack*, 395 U.S. 486 (1969)); *Ill.*

*Migrant Council v. Pilliod*, 540 F.2d 1062, 1067 (7th Cir. 1976) (holding that the plaintiffs had

standing where they had "shown a specific pattern of conduct, akin to an explicit policy," that

"demonstrated a reasonable likelihood of future harm"). And Hope Fair Housing has injured

because it expended resources advocating on behalf of Jafri. *See Havens*, 455 U.S. at 378-79; *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990). Second, Plaintiffs' injuries are fairly traceable to Chandler's decision to sell the accessible spaces and to not create new accessible spaces or make the existing spaces available to persons with disabilities. Third, a favorable decision would remedy those injuries by providing compensatory damages and ensuring that the building is accessible in the future.

Chandler also argues that Plaintiffs' request for equitable relief is moot because Jafri was permitted to lease an accessible parking space. Doc. 38 at 4. That argument fails as well. As a general rule, the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot" because "[t]he defendant is free to return to his old ways." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). If Chandler could satisfy its "heavy" burden of showing that "there is no reasonable expectation that the wrong will be repeated," Plaintiffs' request for injunctive relief would indeed be moot. *Id*. at 633 (internal quotation marks omitted). But Chandler has not attempted to do so by, for example, submitting a plan to make the building accessible for Jafri beyond the two-year lease term or for future residents with disabilities. It follows that "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *Ibid.*; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*, 528 U.S. 167, 189 (2000). Chandler attaches to its reply brief an affidavit averring that it turned over the building to the Association in April 2008, but an averment of that nature from the movant cannot be considered on a Rule 12(c) motion. *See Geinosky*, 745 F.3d at 645 n.1.

-16-

### B. The Sale of Accessible Parking Spaces to Individuals With No Disability

Chandler next argues that it is entitled to judgment on all claims against it because it had

no duty to sell the accessible spaces solely to individuals with disabilities. Doc. 38 at 7-8.

Chandler is right that it had no such duty, but is wrong that this entitles it to judgment on

Plaintiffs' claims.

The FHA requires that the public areas of a building be accessible and that the building

have an accessible route. *See* 42 U.S.C. § 3604(f)(3)(C)(i), (iii)(I). It is true that the FHA does

"not create a right to an assigned handicapped space." *Jankowski Lee & Assocs. v. Cisneros*, 91

F.3d 891, 896 (7th Cir. 1996). But it also is true that there are several avenues that Chandler

might have pursued to satisfy the design-and-construction requirements, such as reserving at least

some accessible spaces for individuals with disabilities, including a clawback provision in the

deeds for accessible spaces that were sold to individuals without disabilities, providing valet

parking, or creating additional accessible parking with the parking spaces it retained or spaces

that it could have repurchased. While the FHA and its implementing regulations do not require

Chandler to choose any particular method, it had to do *something* to comply with its design-and-

construction obligations to make the public areas of the building accessible and to provide an

accessible route. That is, while the sale of accessible spaces to residents without disabilities is

not by itself an FHA violation, such sales may be an FHA violation if they are made without

providing alternative means for making the building accessible. The FHA's design-and-

construction obligations would be neutered if developers or owners could comply simply by

constructing accessible parking spaces (or other accessible components of a structure) even if

they immediately took steps that made those spaces unavailable to persons with disabilities.

Along similar lines, Chandler argues that it fits within the FHAG and FHDM safe harbors because it made two percent of the parking spaces accessible. Doc. 38 at 8 n.3; Doc. 64 at 5-6, 13. This argument fails to persuade. As discussed in Section I, *supra*, for that safe harbor to apply, a building not only must have the requisite number of accessible spaces, but also must make those spaces available to persons with disabilities. The safe harbor does not apply here, at least on the record at the pleadings stage, because Plaintiffs have alleged that Jafri was not provided with an accessible space for an extended period of time and that the lease he ultimately was provided had a limited duration.

### C.     Statute of Limitations

Chandler also argues that Plaintiffs' claims against it are barred by the FHA's two-year statute of limitations. Doc. 38 at 6-7. The statute of limitations provides: "An aggrieved person may commence a civil action … not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A).

In the context of design-and-construction cases like this one, courts have split over what constitutes "the occurrence or the termination of an alleged discriminatory housing practice," and thus over when the two-year limitations period commences. The Seventh Circuit has not addressed the issue. In *Garcia v. Brockway*, 526 F.3d 456 (9th Cir. 2008) (en banc), *cert. denied sub nom.*, *Thompson v. Turk*, 555 U.S. 1069 (2008), the Ninth Circuit held that the limitations period begins running "at the conclusion of the design-and-construction phase, which occurs *on the date the last certificate of occupancy* is issued." *Id.* at 461 (emphasis added); *accord*, *e.g.*, *North Dakota ex rel. N.D. Dep't of Labor v. Matrix Props. Corp.*, 770 N.W.2d 290, 295-96 (N.D. 2009); *Fagundes v. Charter Builders, Inc.*, 2007 WL 2113575, at *5 (N.D. Cal. July 20,

2007); *Taigen*, 303 F. Supp. 2d at 1139-43; *Moseke v. Miller & Smith, Inc.*, 202 F Supp. 2d 492,

507 (E.D. Va. 2002). In *Fair Housing Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 210 F.

App'x 469 (6th Cir. 2006) (citable pursuant to 6th Cir. R. 32.1(a)), *cert. denied sub nom.*, *WKB*

*Assocs., Inc. v. Fair Hous. Council, Inc.*, 552 U.S. 1130 (2008), the Sixth Circuit rejected that

reading of § 3613(a)(1)(A), *id.* at 480, and held that "the limitations period will depend on the

specific circumstances of each case." *Id.* at 481. The Sixth Circuit explained:

> For example, where a disabled individual seeks to buy a particular unit and
> discovers that the unit is inaccessible because it was not designed in
> conformity with the FHA, the limitations period for that individual's claim
> would begin to run from the date that the individual attempted to buy the
> unit and discovered the nonconforming conditions. However, in a case such
> as the instant case, where the plaintiff alleges that the owner or developer
> engaged in a policy or practice throughout the entire development of
> constructing housing units that fail to comply with the FHA, the continuing
> violations doctrine applies to toll the statute of limitations until the sale of
> the last unit in that development. Along those same lines, where the plaintiff
> can show that the owner of several housing developments engaged in a
> continuous policy or practice with regard to the noncompliant design and
> construction of each of the developments, the continuing violation doctrine
> may toll the running of the limitations period until the last unit of all of the
> implicated developments is sold.

*Ibid.*; *accord*, *e.g.*, *Disabled Rights Action Comm. v. Sundance Homes, LLC*, 2011 WL 285827,

at *4 (D. Utah. Jan. 28, 2011); *Hous. Advocates, Inc. v. Berardi & Partners, Inc.*, 2010 WL

4905547, at *6-7 (N.D. Ohio Nov. 29, 2010); *Kuchmas v. Towson Univ*, 553 F. Supp. 2d 556,

562-63 (D. Md. 2008). HUD's position aligns with the Sixth Circuit. *See* FHDM at 22 ("With

respect to the design and construction requirements, complaints could be filed at any time that

the building continues to be in noncompliance, because the discriminatory housing

practice—failure to design and construct the building in compliance—does not terminate.").

-19-

Plaintiffs favor the Sixth Circuit's position in *Olde St. Andrews*, Doc. 42 at 9-12, while

Chandler favors the Ninth Circuit's position in *Garcia*, Doc. 48 at 10-13, Doc. 57 at 11-12.

There is no need to choose sides at this point because, given the record the court may consider on

a Rule 12(c) motion, the limitations defense fails even under *Garcia*'s more stringent reading of

the statute of limitations. As noted in the Background section, the City of Chicago issued seven

"partial certificates of occupancy" for The Chandler between June 2007 and February 2008.

Doc. 50 at 3-9. If the record established that the February 2008 certificate was "the last

certificate of occupancy issued," *Garcia*, 526 F.3d at 461, then the limitations period would have

commenced in February 2008 and this lawsuit, initiated in April 2011, would have been filed

more than one year too late. The trouble for Chandler is that the record establishes no such thing;

the seven certificates of occupancy are all *partial* certificates of occupancy, and even

acknowledging that a partial certificate of occupancy could be the *last* certificate of occupancy

issued, the record does not say, one way or the other, whether the February 2008 certificate

indeed was the last certificate issued for The Chandler. Absent that predicate, the pleadings do

not establish that the last certificate of occupancy was issued at least two years before Plaintiffs'

filed suit. It follows that Chandler's limitations defense fails at the pleadings stage.

The limitations defense might have failed under *Garcia* even if the pleadings

conclusively established that The Chandler's last certificate of occupancy issued more than two

years before this suit was filed. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the

Supreme Court recognized the continuing violation theory under the FHA, holding that "where a

plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative

of the Act, but an unlawful practice that continues into the limitations period, the complaint is

timely when it is filed within [the statutory period running from] the last asserted occurrence of that practice." *Id*. at 480-81. *Garcia* ruled that the continuing violation doctrine does not apply if the only thing that occurred within the limitations period was the continuing harmful effects felt by the plaintiff as a result of an allegedly discriminatory practice that had been completed prior to the limitations period. 526 F.3d at 463. The Seventh Circuit's recent treatment of the continuing violation doctrine indicates that it would agree with this aspect of *Garcia*. *See Bridewell v. Eberle*, __ F.3d __, 2013 WL 5188658, at *5 (7th Cir. Aug. 27, 2013) ("The idea that failing to reverse the ongoing effects of a tort restarts the period of limitations has no support in Illinois law—or in federal law either."); *United States v. Midwest Generation, LLC*, 720 F.3d 644, 648 (7th Cir. 2013) ("enduring consequences of acts that precede the statute of limitations are not independently wrongful").

Left unmentioned in *Garcia*, and endorsed by the Seventh Circuit as an actual continuing violation, is the circumstance where the defendant's alleged wrongful conduct begins outside the limitations period but continues into the limitations period. *See Midwest Generation*, 720 F.3d at 646-47; *Turley v. Rednour*, __ F.3d __, 2013 WL 3336713, at *6-7 (7th Cir. Jul. 3, 2013) (Easterbrook, C.J., concurring). Such circumstances may be present here. "The vast majority of cases to address the issue have recognized the applicability of the continuing violation theory where there were allegations, in multi-property cases, that a developer, manager, or owner of more than one property had a pattern or practice of violating the FHA as a result of design or construction defects." *Nat'l Fair Hous. Alliance, Inc. v. HHHunt Corp.*, 919 F. Supp. 2d 712, 717 (W.D. Va. 2013) (collecting cases). As noted in the Background section, Chandler is closely related to two entities, Magellan and Aqua, that together developed and own (or owned) The

Aqua, a condominium building whose accessible parking policies and practices are, so far as the record reveals, identical to The Chandler's. The record does not reveal if or when the last certificate of occupancy was issued for The Aqua, thus making it unclear whether the statute of limitations has run under *Garcia* on any accessible parking-related FHA violations at The Aqua. It is true that this suit concerns The Chandler, but if Magellan, Aqua, and Chandler are legally and functionally a single entity for purposes of FHA liability—which is plausible on the Rule 12(c) record, *see Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610-11 (7th Cir. 2009); *Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1311 (7th Cir. 1993); *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985); *Bernadin, Inc. v. Midland Oil Corp.*, 520 F.2d 771, 774-75 (7th Cir. 1975); *Allied Chem. Corp. v. Randall*, 321 F.2d 320, 323 (7th Cir. 1963)—then this case plausibly presents a multi-property situation, making relevant the accessible parking policies and practices at The Aqua. It follows that Chandler's limitations defense might fail on the pleadings under the continuing violation theory. *See Nat'l Fair Hous. Alliance*, 919 F. Supp. 2d at 719 (holding that the theory applies because "there is at least a dispute of fact as to whether the two complexes were related so that the alleged violations constitute a continuing pattern or practice").

There is no need to rule definitively on the continuing violation theory because, as shown above, the limitations defense fails under *Garcia* in any event. That also makes it unnecessary to choose between *Garcia* and *Olde St. Andrews* or to resolve the parties' dispute over whether HUD's understanding of the FHA's statute of limitations is worthy of deference. *Cf. Bloch v. Frischholz*, 587 F.3d 771, 781 (7th Cir. 2009) (en banc) ("the Supreme Court has … recognized

that HUD's views about the meaning of the FHA are entitled to great weight") (internal quotation marks omitted).

### III. Chandler's Motion to Dismiss the State's Complaint in Intervention

Chandler seeks dismissal of the State's FHA claims on the same grounds it pressed in seeking judgment on Plaintiffs' claims. Doc. 57 at 4-12. Those grounds are rejected for the reasons set forth above. Chandler seeks dismissal of the State's IHRA and IEBA claims on the ground that the State's allegations do not give rise to an IHRA or IEBA violation. *Id.* at 12-14; Doc. 64 at 13. However, as shown in Section I.B, *supra*, and as Chandler acknowledges, Doc. 64 at 13, the accessibility standards imposed by the IHRA and IEBA are materially identical for present purposes to those imposed by the FHA. Accordingly, the State's IHRA and IEBA claims survive dismissal as well.

### Conclusion

For the foregoing reasons, Chandler's motion for judgment on the pleadings as to Plaintiffs' claims is denied, as is its motion to dismiss the State's claims.

October 4, 2013

_____

United States District Judge